**HAWKER v HAWKER**

Ohio Appeals, 2nd Dist, Montgomery Co

No 1153. Decided Jan 6, 1933

114

KUNKLE, J.

Counsel have requested the court to consider the record in this case with care. We have done so. We have also considered the briefs which have been filed by counsel in support of their respective contentions. The questions presented for our consideration are questions of fact rather than law. There is a sharp conflict in the testimony on some of these questions of fact. Upon the oral argument as·well as in the brief of counsel for plaintiff in error, the error chiefly relied upon is that the judgment of the trial court is against the manifest weight of the evidence.

The case is here on error not upon appeal and the rule governing reviewing courts as to the weight of the testimony has been so frequently announced not only by this court, but by various reviewing courts in the state that it would seem unnecessary to restate such rule. Briefly, however, this court has announced upon different occasions that the findings or judgment of a lower court will not be disturbed unless they are so clearly against the manifest weight of the evidence as to require a reversal upon that ground; that a mere difference of opinion between a reviewing court and a trial court does not warrant the reviewing court in setting aside the judgment of the lower court upon the ground that the judgment is against the manifest weight of the testimony unless it is clearly apparent that such judgment should be reversed.

In addition to the many holdings to the above effect which have been made from time to time by this court, we cite a few of the many decisions upon that question announced by other reviewing courts in Ohio. In the 8th O.A.R. at page 154 in the case of Loney et v Hall the first paragraph of the syllabus is as follows:

"The judgment of the trial judge who has passed upon the sufficiency and weight of the evidence will not be disturbed where the evidence is such that different minds might reach different conclusions."

In the 18th O.C.C. at page 408 in the case of The Eleventh Street Church of Christ v Pennington, the second paragraph of the syllabus is as follows:

"Where the finding and conclusions of a Court of Equity are attacked they are entitled to the same weight and consideration as the verdict of the jury and they will not be disturbed unless manifestly opposed to or unsupported by the evidence."

On page 413 of this case the court in its opinion elaborates upon the duties of a court reviewing the action of a trial judge. In the 37 O.A.R. at page 513 in the case of Blair v Riley, Executor, (9 Abs 669), this court in the 6th and 7th paragraphs of the. syllabus defines the duty of a reviewing court as follows:

"6. Trial courts' conclusions will not be disturbed on error proceedings unless manifestly against the weight of the evidence."

"7. If upon any reasonable interpretation of the evidence the court could have properly reached conclusion represented by the judgment it should not be disturbed."

Applying the rule above announced to the testimony as disclosed by the record and without attempting to quote from the testimony in detail, we are clearly of opinion that the testimony of defendant in error and of the witnesses called by her corroborating her testimony in essential features, showed such acts of cruelty upon the part of plaintiff in error as·would warrant a divorce, if the trial court believed such testimony. The testimony discloses that these parties were married in Greenville, Ohio in April of 1922; that they were living in Dayton, Ohio at the time of the final separation; that they had temporarily separated prior to this final separation but after a short interval resumed their marital relations; that during a portion of their married life they lived in Columbus; that plaintiff in error was engaged in business in Columbus and also in Dayton.

The testimony discloses that prior to the birth of their child the defendant in error not only performed her household duties but assisted plaintiff in error with his office work. She worked about 8 hours a day in their office and arrived at the office in the morning and opened the same; that ordinarily when she left home in the morning to open the office, plaintiff in error was in bed and frequently did not. get around to the office until after the noon hour. The defendant in error in her testimony as

found on pages 3, etc., of the record describes in detail their married life and the many acts of cruelty consisting largely of fault finding, criticising, complaining and the use of profane language toward her.

The culmination of their marital troubles is described by the defendant in error in some detail on pages 10 and 11 of the record. Upon pages 11 and 12 the defendant in error was asked as to her work in the office and she answered as follows:

"Q. Before the baby was born how many hours a day did you put in? A. About eight hours a day.

Q. What time would you get to the office? A. Between eight and eight-thirty in the morning.

Q. Where would Mr. Hawker be when you would go to the office to start work? A. He would be in bed.

Q. What time did he report or come down? A. He never got there before noon —usually it was one o'clock.

Q. How long did you work at his office, with respect to the time of the birth of the baby? A. I worked there until September 1, 1926, and I went to the hospital on September 2, 1926.

Q. For the birth of the baby? A. Yes, sir."

She then narrates the treatment and conduct of plaintiff in error toward her at the office and elsewhere.

On page 14 defendant in error testifies that the plaintiff in error slapped her. Plaintiff in error during the married life of these people was engaged in the selling and servicing of dictaphone equipment and it was work in reference to this business that the defendant in error claims to have performed in her husband's offices located in Columbus and Dayton.

On page 16 of the record the net worth of plaintiff in error and his net income is described in some detail. On page 17 of the record the defendant in error narrates the financial assistance which her parents contributed toward their business and their support which in brief shows that her father gave them some $3500 worth of telephone stock; a wedding present of $1000 which was spent on a honeymoon trip; some $3000 loaned before the marriage; some $1500 borrowed from the father and further testified as follows:

"Q. Were any of those loans paid off? A. He paid the loans off at the bank, all except that last one and he still owes $750.00 on that.

Q. How about the $3000.00 borrowed from your mother and father prior to your marriage? A. He never attempted to pay it back or the interest.

Q. What about the money borrowed from your mother since the marriage? A. He never paid it back—he still owes it."

She also stated that he at the date of the trial was back $145 on the temporary alimony which had been previously allowed by the court.

The acts of cruelty complained of by defendant in error in some respects are corroborated by Chester Hawker, a brother of plaintiff in error on pages 34, etc., of the record and by his wife, Mrs. Chester Hawker on pages 38, etc., of the record. While Chester Hawker is a brother of plaintiff in error, yet the record shows they have had some differences growing out of the settlement of an estate. Mrs. Ries, the mother of defendant in error also corroborates some of the acts of cruelty complained of by defendant in error on pages 42, etc., of the record. On page 44 of the record she details certain improper conduct on the part of the plaintiff in error. On page 46 she testified as follows:

"Q. Don't tell what she said. In any later conversations with Landis Hawker, did he ever say anything to you about how he treated Helen to make her obey him? A. Yes, he said, 'I have struck her to make her obey my judgment.'"

Portions of the conduct of plaintiff in error complained of by defendant in error are also corroborated by Mrs. Seidel of Columbus as found on pages 50, etc., of the record. On page 53 the witness, Mrs. Seidel testifies as follows:

"Q. What kind of a character and reputation has Mrs. Hawker? A. She has a very fine character and I never heard anything against her reputation. She is a talented musician, is very well read and is a fine entertainer.

Q. What were Mr. Hawker's habits when you visited at their home? A. It was his custom not to get up before noon to go to his office and often stated to me that he did not believe in getting up before noon and going down to his office before one o'clock in the afternoon. He expected his wife to get up early in the

morning and be at the office at eight o'clock to open up the office."

Without attempting to further review the evidence offered by defendant in error, we are clearly of opinion that such testimony discloses acts of cruelty upon the part of plaintiff in error which if uncontradicted would have warranted the trial court in rendering the judgment which it did.

The plaintiff in. error called a number of witnesses for the purpose of showing misconduct upon the part of defendant in error. This misconduct consisted principally of excessive drinking and also of undue interest which it is claimed defendant in error took in certain male friends. The testimony upon the subject of her drinking is quite voluminous. This testimony was given in large part by business associates of plaintiff in error and by persons with whom he has been living in an apartment since the separation.

It will be unnecessary to repeat this testimony in detail. Counsel are thoroughly familiar with the same. It consists of parties attended by plaintiff in error, his wife, and the various other persons called by plaintiff in error, their wives and a few invited guests. These parties appear to have become quite frequent. The principal form of entertainment at these parties seems to have consisted of drinking. In passing it might not be amiss to say that from the record the different persons attending these parties were friends, were acquaintances, were associates of plaintiff in error. They were the people among whom the plaintiff in error took his wife when they came to Dayton. At most of these sessions the plaintiff in error was present and joined in the festivities. The complaint is not that the defendant in error drank but that she drank to excess and upon occasions lost control of herself. All of the persons at these parties according to their own admissions were drinking, but all the witnesses called upon this subject by plaintiff in error disclaim having drunk to the extent that they lost control of themselves. They all admit that the plaintiff in error was drinking but there is a remarkable unanimity in their testimony as to the extent of his drinking at these parties. They agree that he never lost control of himself. Some of these parties were held at the home of plaintiff in error.

In rebuttal the defendant in error called a number of prominent people from Greenville, her former home and where defendant in error went with her child after the separation. They testified as to her correct conduct since the separation and particularly as to the splendid manner in which she is caring for this child. Her care and treatment of the child was criticised by some of the witnesses called by plaintiff in error.

From our examination of the record, we find nothing therein which indicates defendant in error was addicted to excessive drinking prior to her marriage to plaintiff in error. Plaintiff in error started his married life by going to Columbus where quite a party was put on at a prominent hotel on the night of his marriage. If the testimony of his witnesses is accepted then these parties were continued during their married life. According to the testimony offered in rebuttal there is no indication that this conduct has been continued by defendant in error since her separation from plaintiff in error.

We will state very frankly after reading this record that if the case had been submitted to us as triers of the facts we might have left these parties where we found them.

The trial court, however, was in so much better position to determine the credibility of the witnesses and the weight to be given their testimony than is a reviewing court. Had we observed the demeanor of these various witnesses upon the stand we might have arrived at the same conclusion that was reached by the trial court.

The record discloses a rather unusual situation. The plaintiff in error contested the right of his wife to a divorce. He called various witnesses to narrate in minute detail the misconduct of his wife upon different occasions. Upon most of these occasions he was present and was a participant in the proceedings. The plaintiff in error knows whether the version given by the defendant in error of many of these transactions is correct or whether the version as given by certain of his witnesses is correct. He did not take the stand. He did not favor the court with his version of what transpired upon these occasions. He was called to the stand twice but both times by counsel for defendant in error for cross examination on matters which did not relate to the conduct of defendant in error. On page 65, etc., he was interrogated in reference to certain matters connected with the affairs of his Columbus office, also as to his being in Chicago recently with Mr. and Mrs. Withers who were among the witnesses called by him and who came to Dayton shortly before the trial. He was also

recalled in rebuttal for cross examination by counsel for defendant in error on page 195 but was not asked and did not enter into a discussion of their family troubles. He stated that he asked her to dismiss her divorce case and come back and live with him and that he now wishes she would dismiss the divorce case. He does not deny any of the acts of cruelty testified to by defendant in error and her witnesses. We do not know whether the failure of the plaintiff in error to give his version of these various transactions which were testified to by defendant in error and by the witnesses called by him, had any influence upon the trial court. The marriage of plaintiff in error to his wife as shown by the record has not been a happy or successful event except in so far as it was clearly a successful financial transaction for plaintiff in error.

The entire case turns upon the credibility of the witnesses and as that is so clearly within the province of the trial judge, as distinguished from the province of a reviewing court, we are of opinion that this court would not be warranted in disturbing the judgment of the lower court. The same will therefore be affirmed.

ALLREAD, PJ, and HORNBECK, J, concur.